IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KWAN SOFTWARE ENGINEERING, INC.,

    Plaintiff,

    v.

FORAY TECHNOLOGIES, LLC,

    Defendant.

No. C 12-03762 SI

**ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; DENYING MOTIONS FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE**

Plaintiff Kwan Software Engineering, Inc., d/b/a Veripic, Inc. ("Veripic") has moved to enjoin defendant Foray Technologies LLC ("Foray") from making certain public representations that allegedly constitute false advertising under § 43(a) of the Lanham Act and under California law. Foray has filed an opposition, and Veripic has replied. The Court held a hearing on the motion on December 17, 2012. Having considered the parties' arguments, the Court hereby DENIES plaintiff's motion for a preliminary injunction, for the reasons discussed below.

**BACKGROUND**

Veripic is a California corporation that provides software for handling digital evidence to police and fire departments, as well as to other entities that need to store and retrieve photos, video, and audio files. First Amended Complaint ("FAC") ¶ 1, 7, 9. Veripic and Foray are direct competitors in the digital evidence-related software market, which mainly consists of law enforcement agencies. *Id.* ¶ 9.

Veripic's complaint states seven causes of action against Foray: (1) copyright infringement; (2) inducement of breach of contract; (3) contributory and induced copyright infringement; (4) violation of the Digital Millennium Copyright Act; (5) false advertising and unfair competition under the Lanham Act; (6) false advertising under California Law; and (7) unfair competition under California Law. However, Veripic's instant motion only seeks to enjoin Foray's behavior with respect to allegations of false advertising under § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and under Cal. Bus. & Prof. Code § 17500, et seq.

Veripic produces and sells the "Digital Photo Lab" ("DPL") software, which is "a centerpiece of its digital evidence management suite designed for law enforcement agencies." FAC ¶ 8. The "most popular" feature of Veripic's DPL software is the "Calibration Module," which permits users to measure the real life length of objects (in inches or metric units) or distances between objects in a photo using a "simple point and click." *Id.* ¶ 10. As a result, users can know the precise distances within photos and accurately print life-size or scaled images. *Id.* ¶ 11.

Foray produces and sells the Authenticated Digital Asset Management System ("ADAMS") software to the same customer base as Veripic targets with its DPL software.[1] *Id.* ¶ 9. Foray's ADAMS software has an "Image Calibration Utility" that performs substantially the same function as Veripic's "Calibration Module" – to allow users to accurately abstract real-life distance from a photo. *Id.* ¶ 15-16. However, until July 2009, Foray's Utility did so in a more "cumbersome" way than Veripic's "simple point and click" method. *Id.* Foray's Utility required customers to know the exact real life horizontal or vertical distance in a photo and to engage in a "multi-step process" in order to obtain real life measurements. *Id.* ¶ 16.

The ADAMS software employs a "hash function," which allows the user to validate whether a piece of digital evidence has been manipulated or altered between the time it is entered into the ADAMS software system and a later time when a user wishes to make use of that piece of digital evidence. *Id.* ¶ 32. Veripic's DPL software has technology that allows the user to validate not only whether digital

---

[1] Although "ADAMS" originally referred to the software at issue in this case, Foray now uses "ADAMS" to cross-brand a suite of related products, including ADAMS Property & Evidence, ADAMS Crime Scene Photo/Video, ADAMS Bag & Tag, ADAMS Latent/ACE-V, and ADAMS Video Interview.

2

evidence has been altered since it was entered in the Veripic software system, but also whether the digital evidence has been altered from the moment the picture was originally taken.

The gravamen of Veripic's false advertising claim is that since 2008, Foray has misled the public about certain industry standards and the capabilities of Foray's own software, and by implication, the capabilities of Veripic's similar software, insofar as they comply with those standards. FAC ¶ 22-39. In particular, it is alleged that Foray falsely represents that its ADAMS software has the ability to "authenticate" images consistent with guidelines propounded by the Scientific Working Group on Imaging Technology ("SWGIT"). *Id.* ¶ 23-24. Accordingly, Veripic now seeks to enjoin Foray from (1) using the name "Authenticated Digital Asset Management System" or "ADAMS" or any other name that states or implies that Foray's software authenticates digital assets; (2) stating that Foray's software authenticates digital assets; (3) representing that SWGIT guidelines endorse the use of hash functions as the best way to authenticate digital assets and that Foray's software complies with SWGIT guidelines; and (4) stating that Foray's software is the only software that complies with the SWGIT "requirement" contained in the workflow described in SWGIT Section 13. If successful on this motion, Veripic also requests that Foray post in a prominent place on the landing site of its website that it has been preliminarily enjoined from making the above statements and linking a copy of the Court's order granting the motion.

**LEGAL STANDARD**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an extraordinary remedy never awarded as of right. *Id.* at 24 (citing *Munaf v. Geren*, 553 U.S. 674, 689-690, (2008)). In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. at 24 (citing *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)).

3

**DISCUSSION**

Veripic contends that an injunction is necessary in order to prevent a loss of prospective customers and damage to its goodwill. Veripic also contends that Foray's misrepresentations threaten the effectiveness of criminal investigations and prosecutions nationwide, where law enforcement officials are erroneously relying on evidence management software that is not capable of doing what it purports to do. Foray responds that Veripic's fears are overstated because the purchasers are highly sophisticated consumers capable of discerning whether the product they purchased is actually capable of performing the functions it purports to perform. More important, Foray denies that the three "false" statements at issue here are literally false, as required by the Lanham Act. Therefore, Foray contends that Veripic has no likelihood of success on the merits. It is to that first issue the Court now turns.

**1. Likelihood of Success on the Merits**

To succeed on a claim of false advertising under the Lanham Act, the plaintiff must show that: (1) the defendant made a false statement either about its own or another's product; (2) in a commercial advertisement; (3) that deceived or has the tendency to deceive a substantial segment of its audience; (4) that the deception is material, in that it is likely to influence the purchasing decision; (5) that the defendant caused its false statement to enter interstate commerce; and (6) plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of the goodwill associated with plaintiff's product. *Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1052 (9th Cir. 2008).[2]

To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). To be "literally false" the statement must be unambiguously false. *In re Century 21-RE/MAX Real Estate Adver. Claims Litig.*, 882 F. Supp. 915, 923 (C.D. Cal. 1994).

---

[2] The parties agree that false advertising under California law requires the same showing of falsity as the Lanham Act.

4

When evaluating statements for literal falsity, the statements should be analyzed in their full context. *Southland Sod Farms*, 108 F.3d at 1139. Where the statements were made to sophisticated consumers with unique background knowledge and experience, the court should consider that as part of the relevant context. *See, e.g., Core-Vent Corp. v. Nobel Industries*, 163 F.3d 605, at * 4 (9th Cir. 1998) (unpub.) ("Of course, we do not ignore the context in which these studies were presented ( . . . to a professional conference and . . . in a scientific journal); *Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, 2010 U.S. Dist. LEXIS 46176, at *18 (W.D. Wash. May 11, 2010) ( to determine literal falsity, "the first question is: what does the person to whom the advertisement is addressed find to be the message?"); *Utah Medical Products v. Clinical Innovations*, 79 F. Supp. 2d 1290, 1309 (D. Utah 1999) ("While actual consumer confusion is not necessary to assert a claim of literal falsity, the perspective of the relevant consumer population is necessary in determining whether the advertising could be viewed as false.").

Three statements are at the heart of Veripic's false advertising claim. Foray contends that Veripic cannot establish falsity, materiality, and injury for any of the three statements. As to falsity, Veripic contends only that the statements are literally false. Veripic does not present any evidence that, in the alternative, the statements misled, confused, or deceived consumers. All three statements revolve around the meaning of the term "authenticity" as that term is understood by law enforcement customers and others in the market for digital evidence management software.

**A.      Statement One**

Veripic alleges that Foray has disseminated the following false statement in advertisements and responses to requests for proposals: "Foray's ADAMS software is the only software that complies with the SWGIT 'requirement' contained in the workflow described in Section 13, *Best Practices for Maintaining the Integrity of Digital Images and Digital Video* of the SWGIT Guidelines." Mot. at 7. Connected with that statement, Foray also advertises "NOTE: While some vendors may claim they are ASCLD or SWGIT compliant, no other digital evidence management vendor complies with the SWGIT workflow #2 [described in Section 13 of the SWGIT Guidelines]. ONLY the FORAY ADAMS solution

1 meets this requirement!" *Id.* at 9. Foray made these statements to law enforcement agencies in Oakland County, Michigan and Seattle, Washington. Kwan Decl., Exs. A, B.

Veripic argues that this statement is literally false in two ways: (1) the Section 13 SWGIT workflow ("Section 13") referenced in Foray's advertisement is not a "requirement," but rather it is "workflow #2" of four "example" workflows listed in that section; (2) the word "only" is literally false because ADAMS is not alone among software consistent with this workflow, since Veripic's DPL software is also consistent with this workflow. Foray contends that this statement is accurate in its context.

The "requirement" at issue here is referred to as an "example" in the SWGIT workflow. Siegel Decl., Ex 1 at 4. Each "workflow" is simply a list of steps users may take in order to achieve some software objective. SWGIT describes these workflows as "best practices" and prefaces that, "[t]he following . . . list of specific workflow examples . . . is not exhaustive as each situation requires tailoring a specific process that should be outlined in an organization's SOPs." *Id*. Veripic contends that calling an example a "requirement" is literally false. Foray argues that its use of "requirement" does not mean that its software is the *only* way to be consistent with the SWGIT workflow. Rather, its ADAMS software is *one known* way to comply with SWGIT. In context, the Court agrees with Foray. The Oxford English Dictionary defines "requirement" as "something wanted or needed." Oxford English Dictionary, 3d Ed. Here, Foray states that its use of "requirement" is intended to convey that its software uses a series of steps known to be wanted or needed by the example workflow – i.e, consistent with it, as it is written. Foray argues that its use of "requirement" does not exclude the possibility that others can add or change steps in the workflow. Its use here only guarantees to customers that Foray's software, at a minimum, is consistent with the example.

Veripic also takes issue with Foray's assertion that *only* its ADAMS software complies with workflow #2. Veripic contends that this use of "only" is literally false because Veripic's DPL software also "fits within the same workflow." Mot. at 10. However, Veripic undercuts its argument in the very same sentence, noting that in complying with the workflow, DPL "also provides other features to ensure the integrity of digital evidence stored in its stems." *Id.* Veripic's product cannot be literally consistent with the workflow where its product deviates from the steps listed in that workflow in order to "provide

6

1 other features." Foray contends that it uses "only" to mean that its software is the only one that meets 2 the workflow's specific series of steps, not its general outcome. As Foray points out, the left column 3 of workflow #2 describes a series of steps in which copies of the original image are created, so that 4 processing functions can be performed in an outside program, while maintaining the original image. 5 *See* Kwan Decl., Ex. A at 13. In other words, the user can make working copies of digital files and work 6 on them in other imaging software, such as Adobe Photoshop. Veripic specifically eschewed this 7 process as cumbersome and brags that its DPL "has methods for enhancing images without changing 8 the actual file, and without creating messy duplicates, allowing you to enhance your evidence but never 9 compromise it." Witzke Decl., Ex. A. Thus, Veripic's DPL software does not simply have "other 10 features." Rather, it has an entirely different, perhaps better or simpler method for achieving the 11 outcome described in workflow #2, that nonetheless does not literally comply with it. Moreover, Foray 12 has shown that it literally complies with the specific set of steps described in the workflow, regardless 13 of whether other workflows can be designed to achieve the same outcome. Therefore, the Court cannot 14 say that Veripic is likely to succeed on the merits of its Lanham Act claim with respect to this statement, 15 where it has not made a threshold showing of literal falsity.

### B.     Statement Two

Veripic argues that Foray's statement "that its ADAMS software complied with SWGIT guidelines that state that the use of a hash function is the best way to authenticate digital assets" is also literally false. According to Veripic, hash functions do not allow a user to authenticate, as SWGIT uses that term, but rather, hash functions validate integrity. Section 13 of the SWGIT guidelines, cited by Foray in support of the above statement, is entitled "Best Practices for Maintaining the Integrity of Digital Images and Digital Video." Siegel Decl., Ex. 1. Veripic says this section has "nothing to do with authenticating digital assets." Mot. at 10. On Veripic's reading, SWGIT guidelines draw a bright line distinction between "integrity" and "authenticity." SWGIT guidelines state, "authenticity differs significantly from integrity." Siegel Decl., Ex. 1. Accordingly, "[i]ntegrity ensures that the information presented is complete and unaltered from the time of acquisition until its final disposition. For example, the use of a hash function can verify that a copy of a digital image file is identical to the file from which

1 it was copied, but it cannot demonstrate the veracity of the scene depicted in the image." *Id.*, Ex. 2.
2 Authenticating software, however, validates whether "a questioned image or video is an accurate
3 representation of the original data by some defined criteria." *Id.* In response, Foray argues that there
4 are various industry understandings of "authenticity" and "integrity," and that integrity as Veripic
5 defines it, is really a subset of authenticity. In other words, there are at least two types of authenticity:
6 (1) acquisition authenticity (what Veripic calls "integrity"), which ensures that the file itself has not
7 been changed since created or acquired; and (2) subject matter authenticity, which ensures that the photo
8 is what it purports to be, the substance of the photo has not been altered, and one can rely on the photo
9 to draw real world conclusions, such as distance and position.

10 Although Veripic argues that the distinction between integrity and authenticity is inviolate, Foray
11 presents significant evidence that the terms are ambiguous, overlapping, and sometimes interchangeable.
12 Notwithstanding their warning that the terms are distinct, SWGIT's guidelines, read in their entirety,
13 use those terms loosely and interchangeably. For example, in Section 13, SWGIT states "authentication
14 is the process of substantiating that the content is an accurate representation of what it purports to be."
15 Siegel Decl., Ex. 1. Yet in Section 14, SWGIT refers to authenticity, stating, "[i]n the absence of a
16 witness who can testify to the origin of a questioned image or video, it may be possible for an examiner
17 to authenticate such data by identifying its origin." *Id.* Ex. 2. In other words, Section 14 suggests that
18 authentication requires confirmation of the origin of data, which is precisely what Veripic says is part
19 of integrity validation, *not* authentication. In fact, how would one know that data is an accurate
20 representation of what it purports to be (Veripic's "authenticity") without necessarily confirming that
21 the data is complete and unaltered (Veripic's "integrity") since its creation? Veripic's own promotional
22 materials define Foray's ADAMS as "acquisition authentication" software, which "refers to knowing
23 that a photo hasn't changed starting from when it *enters the computer* moving forward." Witzke Decl.,
24 ¶ 7, Ex. A, VeriPic FAQ ¶ 2 (emphasis in original).

25 Moreover, law enforcement professionals in the industry use authenticity in a variety of ways,
26 some of which are consistent with what Foray claims its ADAMS software actually does. According
27 to Foray's expert Kerri McClary, "authenticate" frequently refers to the various steps taken when
28 capturing, processing and handling digital photographs to maintain their "authenticity" in order to

8

1  provide a foundation in court that the digital photograph accurately portrays the scene.[3] McClary Decl.,
2  ¶ 5. Veripic's rebuttal declaration by Richard McEvoy, Jr., does not actually dispute this. *See* McEvoy
3  Decl., ¶ 10 ("procedures for authentication of digital evidence must encompass the entire lifespan of that
4  evidence . . . "). Authenticity in the legal evidentiary context encompasses both acquisition and subject
5  matter authenticity, i.e., a witness may testify that a photo accurately depicts the then-existing reality,
6  and also by implication, that the photo file has not been manipulated.

The evidence presented by the parties demonstrates that at best, that term authenticity is ambiguous as used in Foray's public statements. The SWGIT definition cited by Veripic states that authentication is used "to discern if a questioned image or video is an accurate representation of the original data by some defined criteria." Siegel Decl., Ex. 2. However, SWGIT Guidelines nowhere define the criteria. Accordingly, Veripic has not shown that there is a clear-cut definition of authenticity from which Foray's statements clearly and unambiguously deviate. Customers in the market for "authenticating" software have multiple understandings of what authenticating software is capable of doing and what criteria to use to set authentication expectations. Sellers and industry experts similarly have multiple understandings. Given this ambiguity, the Court cannot say that Veripic is likely to succeed on the merits of its Lanham Act claim based on this statement.

### C. Statement Three

The third Foray statement Veripic alleges is literally false is that the "ADAMS software 'authenticates' digital assets" and that therefore, Foray misleads consumer in naming its software "Authenticated Digital Asset Management System" (i.e., ADAMS). The view that its software authenticates is "a foundational part of Foray's markets and sales of its software." Mot. at 12. In support, Veripic cites the signature block of Foray employee emails, which describe Foray as offering "image authentication solutions." Kwan Decl., Ex. E. This signature block, noting that Foray offers "solutions" plural, actually supports Foray's contention that it uses authentication to refer to its suite of products that involve not just crime scene photographs, but also latent fingerprints, footwear

---

[3] Veripic's evidentiary objection to the McClary declaration, that it was unsigned, is OVERRULED. Foray has properly validated the signature. *See* Docket No. 47.

1 impressions, blood spatter, and other kinds of evidence that its software authenticates, as industry
2 consumers think of that term. Moreover, the Court has already discussed why Veripic has not
3 demonstrated literal falsity by using SWGIT guidelines as the standard from which Foray's claims of
4 authenticity deviate.

5     Veripic contends that Foray's definition of authenticity is also inconsistent with the way the
6 National Institute of Standards and Technology ("NIST") uses that term. Foray advertises that, "[o]nly
7 Foray Technologies uses a SHA-256 secure hash algorithm, which is the current NIST standard (NIST
8 FIPTS 180-2 Secure Hash Algorithm) for authenticating digital evidence." Kwan Decl., Ex. A. NIST
9 FIPTS 180-02 has four algorithms, SHA-1, SHA-256, SHA-384, and SHA-512. *Id.,* Ex. D. These
10 algorithms, including SHA-256, "produce a condensed representation" of a computer file called a
11 "message digest." *Id.* And the message digest for each computer file is unique. *Id.* Thus, software can
12 deduce whether a file has been altered by comparing message digests at different points in the life of
13 a file. And according to NIST, "[t]hese algorithms enable the determination of a message's integrity."
14 *Id.* Thus, Veripic contends that nowhere does NIST FIPTS 180-2 state that these algorithms have
15 anything to do with authentication.

16     NIST does mention authentication in the very next sentence, stating that message digests help
17 generate "authentication codes," which are part of confirming "integrity." Kwan Decl, Ex. D. Thus,
18 rather than resolve the ambiguity, Veripic's reference to NIST only exacerbates it. Foray points to
19 evidence from an October 2, 2012, press release in which NIST announced the winner of its five-year
20 competition to find a new cryptographic hash algorithm, where it wrote, "[h]ash algorithms are use
21 widely for cryptographic applications that ensure the authenticity of digital documents, such as digital
22 signatures and message authentication codes." Hennings Decl., ¶ 5, Ex. A. Moreover, Veripic's
23 president, John Kwan, used a similar understanding of authentication in a patent application, stating,
24 "[t]his invention relates to methods of data authentication and more particularly, but not exclusively,
25 provides a system and method for creating, attaching, and using [hash functions] of digital data to
26 authenticate the claim." Hennings Decl., ¶ 6, Ex. B.

27     Veripic argues that Foray has for years used NIST and SWGIT as reference points to frame the
28 meaning of "authentication" and it cannot now disclaim that use. As an example, Veripic points to a

10

presentation by Foray's vice president of program management, David Witzke, to the International Association for Identification, wherein he states that SWGIT "provide[s] us with the guidelines for the processing of anything digital." Wu Decl., ¶¶ 3-4, Ex. W1. But later in that presentation, consistent with Foray's position here, Witzke states, "[u]nder section 13 of the SWGIT guidelines we actually get into some of the requirements for tracking and maintaining the authentication of images." *Id.* In other words, Foray is suggesting publicly that it understands SWGIT Section 13 to address acquisition authenticity.

Given the state of the evidence, Foray's use of authenticity in its advertising is far from being literally false, understood in context. Veripic relies on a hair splitting, literal reading of NIST and SWGIT statements that are themselves inconsistent or ambiguous. Accordingly, Veripic has not offered evidence sufficient to justify an injunction because it has not shown likely success on the merits. Because Veripic is unlikely to be able to show falsity, the Court need not address the parties' additional arguments regarding materiality and injury, except to say that Veripic's arguments here likewise appear to be weak. Similarly, the Court need not address Foray's argument that Veripic has unclean hands, and that Veripic's authentication argument is actually an undeclared trademark infringement action.

**2.      Irreparable Harm**

Plaintiffs must also establish a likelihood that they will suffer irreparable harm absent injunctive relief. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). In particular, plaintiffs must establish that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Boomerangit, Inc. v. ID Armor, Inc.*, 2012 U.S. Dist. LEXIS 86382, at *11 (N.D. Cal. June 21, 2012).

Veripic's theory of irreparable harm is that it will lose *prospective* customers and business goodwill. While goodwill and loss of prospective customers may sometimes support a finding of irreparable harm, see *Stuhlbarg Int'l Sale Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001), Veripic has presented no evidence of actual losses. At best, it presents a speculative declaration from its company president in which he states that six customers have told Veripic that it was their understanding that "Foray authenticated digital images in the same manner as Veripic." Kwan Decl.

11

¶ 25. Moreover, Kwan states that he only recently became aware of what Foray was telling customers to deceive them into believing Foray authenticates digital images. *Id*. ¶ 26. And "on information and belief," Kwan believes that Veripic has lost several customers to whom Foray previously sent an advertisement regarding Foray's alleged compliance with SWGIT Section 13's "requirement." *Id.* ¶ 27.

Veripic's arguments are unavailing for several reasons. First, as to the urgency of an injunction, Veripic was made aware, or should have been aware of, Foray's alleged misrepresentations since at least June 1, 2011, when the City of Seattle made available to Veripic the Foray request for proposal response that contains the offending statements. *See* Kwan Decl., ¶ 8, Ex. B. Such a delay hardly bespeaks of the urgency typical in successful preliminary injunction motions. *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.* 762 F.2d 1374 (9th Cir. 1985) ("Plaintiff's long standing delay seeking a preliminary injunction implies a lack of urgency and irreparable harm."). Second, Veripic fails to present any evidence tending to show that the loss of customers is anything more than speculation or the result of legitimate competition. In fact, most customers purchase one of these competing software suites only after first reviewing responses to requests for proposals, company presentations and extensive research. Thus, any loss of customers may be due to the fact that as between ADAMS and DPL, customers with knowledge of the differences between the products – whether called integrity validation or authentication – prefer one brand over the other.

Veripic has not shown that the harm it imagines is more than speculative. Accordingly, it has not shown irreparable harm sufficient to justify a preliminary injunction.

**3.    Balance of Hardships**

Veripic seeks a broad, five part injunction, wherein Foray would be enjoined from (1) using the name "Authenticated Digital Asset Management System" or "ADAMS" or any other name that states or implies that Foray's software authenticates digital assets;  (2) stating that Foray's software authenticates digital assets; (3) representing that SWGIT guidelines endorse the use of hash functions as the best way to authenticate digital assets and that Foray's software complies with SWGIT guidelines; and (4) stating that Foray's software is the only software that complies with the SWGIT "requirement" contained in the workflow described in SWGIT Section 13. Veripic also requests that Foray post in a

prominent place on the landing site of its website that it has been preliminarily enjoined from making the above statements and linking a copy of the Court's order granting the motion.

The scope of the relief sought goes far beyond preserving the status quo before trial. Veripic effectively proposes that Foray discontinue or change the entire branding of its products. As Foray states, this would end its business during the pendency of this case. Such drastic relief cannot be supported only by speculation that future customers may not purchase Veripic products.

**4. Public Interest**

Veripic has not made a sufficient showing that the injunction it seeks is in the public interest. Veripic is correct that there may be crucial legal implications of having law enforcement erroneously rely on software that does not do what it purports to do. Veripic contends that ultimately, evidence may be thrown out of court because it was not properly authenticated. Mot. at 21. This concern, however, is overstated and unsupported. Here, sophisticated customers invest significant time and energy into purchasing this software, and also have precise understandings of what they need that software to be able to do in order to gather, store, and validate evidence in a legal setting. Veripic presents no evidence to the contrary. Therefore, Veripic has not stated a compelling public interest in an injunction.

**CONCLUSION**

For the foregoing reasons, Veripic has not shown that an injunction should issue. Accordingly, the Court hereby DENIES Veripic's motion for a preliminary injunction. The Court also DENIES as MOOT Foray's motion for leave to file a declaration and deposition testimony and DENIES as untimely Veripic's administrative motion for leave to file supplemental evidence. This order resolves Docket Nos. 22, 48 and 52.

**IT IS SO ORDERED.**

Dated: January 22, 2013

SUSAN ILLSTON
United States District Judge