1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KWAN SOFTWARE ENGINEERING, INC., a
California corporation, d/b/a VeriPic, Inc.,

        Plaintiff,

  v.

FORAY TECHNOLOGIES, LLC, a Delaware
limited liability company,

        Defendant.

_____/

No. C 12-03762 SI

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

     Defendant Foray Technologies, LLC ("Foray")'s motion for summary judgment came on for oral argument on February 7, 2014. Having considered the parties' motion papers, pleadings and arguments, the Court GRANTS defendant's motion for summary judgment.[1]

---

     [1] On January 28, 2014, plaintiff Kwan Software Engineering, Inc. d/b/a VeriPic, Inc. ("VeriPic") filed a motion to strike. Docket No. 141. In the motion, VeriPic moves to strike (1) Foray's objections to the evidence filed in support of VeriPic's opposition and (2) the evidence Foray filed in support of its reply brief. Docket No. 141. For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the motion to strike.

     In its opposition to the motion to strike, Foray concedes that its filing of the objections was in violation of Civil Local Rule 7-3(c), and, therefore, Foray does not object to the Court striking the filing. Docket No. 148 at 1. Accordingly, the Court STRIKES Foray's objections to VeriPic's evidence, Docket No. 131.

     With respect to the reply evidence, VeriPic argues that it is improper to file any new evidence along with a reply brief, and, therefore, the Court should strike the evidence attached to Foray's reply. Docket No. 141 at 1. However, Civil Local Rule 7-3(c) permits additional evidence to be attached to a reply brief. If a party disputes the evidence filed in support of a reply brief, the proper procedure under the Local Rules is to file objections to the reply evidence, not a motion to strike the evidence. *See*

United States District Court
For the Northern District of California

**BACKGROUND**

VeriPic is a California corporation that provides digital evidence-related software to police and fire departments, as well as to other entities that need to store and retrieve photos, video, and audio files. First Amended Complaint ("FAC") ¶ 1, 7, 9. VeriPic and Foray are direct competitors in the digital asset management software market, which mainly consists of law enforcement agencies. *Id.* ¶ 9.

VeriPic produces and sells the "Digital Photo Lab" ("DPL") software, which is "a centerpiece of its digital evidence management suite designed for law enforcement agencies." FAC ¶ 8. One of the "most popular" features of VeriPic's DPL software is the "Calibration Module," which permits users to measure the real life length of objects (in inches or metric units) or distances between objects in a photo using a "simple point and click." *Id.* ¶ 10. As a result, users can know the precise distances within photos and accurately print life-size or scaled images. *Id.* ¶ 11.

Foray produces and sells the "Authenticated Digital Asset Management System" ("ADAMS") software to the same customer base as VeriPic targets with its DPL software.[2] *Id.* ¶ 9. Foray's ADAMS software has an "Image Calibration Utility" that performs substantially the same function as VeriPic's "Calibration Module" – to allow users to accurately abstract real-life distance from a photo. *Id.* ¶ 15-16. VeriPic contents that, until July 2009, Foray's Utility did so in a more "cumbersome" way than VeriPic's "simple point and click" method. *Id.*

In addition, the ADAMS software employs a "hash function," which allows the user to validate whether a piece of digital evidence has been manipulated or altered between the time it is entered into the ADAMS software system and a later time when a user wishes to make use of that piece of digital evidence. *Id.* ¶ 32. VeriPic's DPL software has technology that allows the user to validate not only whether digital evidence has been altered since it was entered, but also whether the digital evidence has been altered from the moment the picture was originally taken.

---

Civ. L.R. 7-3(d)(1). Accordingly, the Court declines to strike the evidence filed in support of Foray's reply.

[2] Although "ADAMS" originally referred to the software at issue in this case, Foray now uses "ADAMS" to cross-brand a suite of related products, including ADAMS Property & Evidence, ADAMS Crime Scene Photo/Video, ADAMS Bag & Tag, ADAMS Latent/ACE-V, and ADAMS Video Interview.

United States District Court
For the Northern District of California

On July 18, 2012, VeriPic filed a complaint against Foray. On July 30, 2012, VeriPic filed a first amended complaint, alleging causes of action for: (1) copyright infringement; (2) inducement of breach of contract; (3) contributory and induced copyright infringement; (4) violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.*; (5) false advertising and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (6) violation of California False Advertising Law ("FAL"), California Business and Professions Code § 17500 *et seq.*; and (7) violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200 *et seq.* Docket No. 4, FAC.

On October 1, 2012, VeriPic filed a motion for a preliminary injunction based on its false advertising claims. Docket No. 22. On January 22, 2013, the Court denied VeriPic's motion. Docket No. 62. In the denying the motion, the Court held that VeriPic had failed to show a likelihood of success on the merits of its false advertising claims because it had failed to show literal falsity. Docket No. 62 at 4-11. VeriPic appealed the Court's denial of the motion. Docket No. 63. On December 27, 2013, the Ninth Circuit affirmed the Court's denial of the motion. Docket No. 116. The Ninth Circuit held that VeriPic had failed to prove a likelihood of success on its false advertising claims, and stated that "[t]he district court properly held that VeriPic had failed to make a threshold showing of literal falsity." *Id.* at 2.

By the present motion, Foray moves for summary judgment of all of plaintiff's claims. Docket Nos. 93, 107. In addition, Foray moves for summary judgment of its affirmative defenses of laches and unclean hands. *Id.*

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

United States District Court
For the Northern District of California

1  Once the moving party has met its burden, the burden shifts to the nonmoving party to "set forth,

2  by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for

3  trial.'" *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

4  (citing *Celotex*, 477 U.S. at 324). To carry this burden, the non-moving party must "do more than

5  simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

6  *Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of

7  evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

8  the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

9  In deciding a summary judgment motion, the Court must view the evidence in the light most

10  favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

11  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from

12  the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.*

13  However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

14  genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d

15  730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

16

17  **DISCUSSION**

18  **I.  Plaintiff's False Advertising Claims**

19  Foray moves for summary judgment of VeriPic's false advertising claims, arguing that none of

20  the statements at issue were false or deceptive. Docket No. 107 at 7-18. In response, VeriPic argues

21  that there is at least a genuine dispute of fact as to whether Foray's advertising is deceptive. Docket No.

22  124-27 at 1-17. Specifically, VeriPic argues that its survey evidence shows that Foray's advertising is

23  deceptive, and that Foray's statements are literally false. *Id.*

24  To succeed on a claim of false advertising under the Lanham Act, the plaintiff must show that:

25  (1) the defendant made a false statement either about its own or another's product; (2) in a commercial

26  advertisement; (3) that deceived or had the tendency to deceive a substantial segment of its audience;

27  (4) that the deception was material, in that it was likely to influence the purchasing decision; (5) that

28  the defendant caused its false statement to enter interstate commerce; and (6) plaintiff has been or is

likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of the goodwill associated with plaintiff's product. *Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1052 (9th Cir. 2008). To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

"'In the Ninth Circuit, claims of unfair competition and false advertising under [the FAL and the UCL] are substantially congruent to claims made under the Lanham Act[.]'" *Cytosport, Inc. v. Vital Pharms., Inc.*, 894 F. Supp. 2d 1285, 1295 (E.D. Cal. 2012) (quoting *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007)); *see also Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008) ("The California Supreme Court has recognized that [the UCL and the FAL] prohibit not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."). Therefore, at the summary judgment stage, the analysis for plaintiff's three false advertising claims is the same.[3] *See Cytosport*, 894 F. Supp. 2d at 1295; *Walker & Zanger*, 549 F. Supp. 2d at 1182.

### A.     Likely to Mislead or Deceive Consumers

VeriPic argues that its expert market survey of the law enforcement community shows that there is a material dispute of fact as to whether Foray's advertising is deceptive. Docket No. 124-27 at 1-3. In response, Foray argues that the survey is fatally flawed because the survey does not examine the relevant market—the recipients of Foray's advertising and people who are potentially purchasers of Foray's products. Docket No. 126 at 6-8.

Consumer surveys may be used as evidence to show that the alleged misrepresentations have misled, confused, or deceived the consuming public. *Southland Sod Farms*, 108 F.3d at 1140. Survey evidence must meet the requirements under Federal Rule of Evidence 702 for admissibility of expert evidence. *See, e.g.*, *id.* at 1142-43 & n.8. Under Rule 702, a court may permit opinion testimony from

---

[3] In their briefing, the parties do not dispute that the same analysis applies to plaintiff's three false advertising claims.

United States District Court
For the Northern District of California

an expert only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 requires that the trial court act as a "gatekeeper" by "making a preliminary determination of whether the expert's testimony is reliable." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The proponent of the expert testimony has the burden of proving the proposed expert testimony is admissible. *Stambolian v. Novartis Pharms. Corp.*, 2013 U.S. Dist. LEXIS 173016, at *6 (C.D. Cal. Dec. 6, 2013) (citing *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)). In addition, the decision whether to admit or exclude expert testimony lies within the trial court's discretion. *See GE v. Joiner*, 522 U.S. 136, 141-42 (1997); *United States v. Calderon-Segura*, 512 F.3d 1104, 1109 (9th Cir. 2008).

> To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.

*Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 166 (S.D.N.Y. 2012). "The failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility." *Id.*

Here, VeriPic has failed to show that the survey examined the proper universe of consumers. In its briefing, VeriPic states that the survey examined members of the law enforcement community that are digital photo users—the potential users of Foray's software. Docket No. 124-27 at 1-2; Docket No. 140-4 at 1-3; *see also* Docket No. 140-5, Shah Decl. Ex. B at 59:6-59:13. VeriPic's expert explained that the survey focused on potential users of the software rather potential purchasers, because the software is designed for and purchased for its users, rather than purchasers. Docket No. 140-5, Shah Decl. Ex. B at 55:18-56-9; 64:12-23.

First, it appears that the survey did not actually focus on potential users of Foray's software. According to VeriPic's expert, the survey focused on members of the law enforcement community who

6

"used photos at work."  Docket No. 140-5, Shah Decl. Ex. B at 140:21; *see also* Docket No. 120-1, Siegel Decl. Ex. FS1 at 5-6, 21.  But, VeriPic's expert does not state that most of these "photo users" have also used or are familiar with the type of photo software at issue.[4]  To the contrary, her expert report states:  "Almost 7 in 10 law enforcement personnel used some form of photo evidence in their role but most were unfamiliar with the photo management software programs."  Docket No. 120-1, Siegel Decl. Ex. FS1 at 14.

Second and more importantly, VeriPic has failed to show that potential users of the software are the relevant audience for its false advertising claims.  To succeed on its false advertising claims, VeriPic must show that the alleged misrepresentations deceived or had the tendency to deceive a substantial segment of its audience; and that the deception was material, in that it likely influenced the decision to purchase the product.  *See Newcal*, 513 F.3d at 1052.  VeriPic has not shown that any of the members of the survey are people who would see the alleged misrepresentations—Foray's audience—or people who are potential purchasers of the products—those whose decision to purchase the product could be influenced.  The evidence before the Court shows that the allegedly false statements at issue were made in responses to requests for proposals ("RFPs"), direct emails, and displays at trade shows.  *See, e.g.*, Docket No. 119, Kwan Decl. Exs. K1, K2, K3, K6; Docket No. 124, Siegel Decl. Exs. DS6, DS7, DS15, DS16, DS17, DS18.  VeriPic has made no attempt to show that mere photo users in the law enforcement community would see these materials.  Without such a showing, the Court cannot conclude that the survey examined the proper universe of consumers.  *See Eprova v. BrookStone Pharms.*, 920 F. Supp. 2d 404, 418 (S.D.N.Y. 2013) ("a. Consumer Surveys [¶] In determining whether a challenged advertisement is likely to confuse or mislead customers, courts must look to the person to whom the advertisement is addressed.  *Am. Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 166 (2d Cir. 1978).  Because [defendant]'s labels and package inserts were intended to encourage product substitution, and thus directed in part to pharmacists and physicians . . . , [plaintiff] surveyed those

---

[4] In her report, the expert asserts: "Almost 9 in 10 of those who use photos at work also use photo management software."  Docket No. 120-1, Siegel Decl. Ex. FS1 at 23.  However, to support this assertion, the expert relies on the following question:  "Are you aware that many law enforcement agencies use software that stores and tracks digital photos and other digital evidence?"  *Id.*  An affirmative response to this question, concerning "awareness," does not necessarily mean that the responding individual uses that software.

1  groups."). Therefore, VeriPic has failed to meet its burden of showing the reliability and relevance of

2  the survey. The survey is the sole piece of evidence that VeriPic has put forth in support of its assertion

3  that the challenged statements are likely to mislead or confuse consumers. Accordingly, VeriPic has

4  failed to show that there is a genuine dispute of fact as to whether the challenged statements are likely

5  to mislead or confuse consumers.

6

7      **B.      Literal Falsity**

8          VeriPic argues that Foray's motion for summary judgment should be denied because Foray's

9  advertising is literally false. Docket No. 124-27 at 7-17. In making this argument, Verpic identifies two

10 categories of statements: (1) statements regarding authentication; and (2) statements regarding SWGIT

11 Workflow #2. *Id.* at 7.

12         The standard for proving literal falsity is rigorous. *Buetow v. A.L.S. Enters.*, 650 F.3d 1178,

13 1185 (8th Cir. 2011). To be "literally false" the statement must be unambiguously false. *In re Century*

14 *21-RE/MAX Real Estate Adver. Claims Litig.*, 882 F. Supp. 915, 923 (C.D. Cal. 1994); *accord Time*

15 *Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) ("'[O]nly an unambiguous

16 message can be literally false.' Therefore, if the language or graphic is susceptible to more than one

17 reasonable interpretation, the advertisement cannot be literally false." (citation omitted)). When

18 evaluating statements for literal falsity, the statements should be analyzed in their full context.

19 *Southland Sod Farms*, 108 F.3d at 1139. Where the statements were made to sophisticated consumers

20 with unique background knowledge and experience, the court should consider that as part of the relevant

21 context. *See, e.g., Core-Vent Corp. v. Nobel Industries*, 163 F.3d 605, at * 4 (9th Cir. 1998) (unpub.)

22 ("Of course, we do not ignore the context in which these studies were presented (. . . to a professional

23 conference and . . . in a scientific journal)"); *Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, 2010 U.S.

24 Dist. LEXIS 46176, at *18 (W.D. Wash. May 11, 2010) (to determine literal falsity, "the first question

25 is: what does the person to whom the advertisement is addressed find to be the message"); *Utah Medical*

26 *Products v. Clinical Innovations*, 79 F. Supp. 2d 1290, 1309 (D. Utah 1999) ("While actual consumer

27 confusion is not necessary to assert a claim of literal falsity, the perspective of the relevant consumer

28 population is necessary in determining whether the advertising could be viewed as false."). In order to

United States District Court
For the Northern District of California

1  determine whether a claim is literally false, courts may also look to objective industry standards.  *See*

2  *Compaq Computer Corp. v. Packard Bell Elecs.*, 163 F.R.D. 329, 336 (N.D. Cal. 1995).

3      Literal falsity is a question of fact.  *K&N Eng'g, Inc. v. Spectre Performance*, 2011 U.S. Dist.

4  LEXIS 107681, at *36 (C.D. Cal. Sept. 20, 2011) (citing *Southland Sod Farms*, 108 F.3d at 1144-45).

5  However, a Court may properly grant summary judgment where no reasonable jury could conclude that

6  the challenged statements are literally false.  *See, e.g.*, *eMove Inc. v. SMD Software Inc.*, 2012 U.S. Dist.

7  LEXIS 55625, at *38-41 (D. Ariz. Apr. 20, 2012); *Plastwood SRL v. Rose Art Indus.*, 2008 U.S. Dist.

8  LEXIS 101157, at *13-18 (W.D. Wash. Dec. 5, 2008).

9

10      i.    Statements Regarding Authentication

11      VeriPic asserts that Foray's representation that its ADAMS software authenticates digital

12  evidence is literally false.  Docket No. 124-27 at 7-15.  Foray's ADAMS software employs a hash

13  function.  Docket No. 107 at 9; Docket No. 124-27 at 3-4; Docket No. 100-6, Cox Decl. Ex. G at 88:5-

14  93:15.  This function allows the user to validate whether a piece of digital evidence has been altered

15  between the time it is entered into the ADAMS software system and a later time when a user wishes to

16  make use of that piece of digital evidence.  *Id.*  VeriPic's DPL software has technology that allows the

17  user to validate not only whether digital evidence has been altered since it was entered into the system,

18  but also whether the digital evidence has been altered from the moment the picture was originally taken.

19  Docket No. 126 at 5-6; Docket No. 45 at 5; Docket No. 45-1, Kwan Decl ¶¶ 13-15.  Therefore, the

20  relevant distinction between the two pieces of software is the time frame for which the software can

21  verify that the image has not been altered.  Foray's software can verify from the time the digital

22  evidence has been placed in the system until retrieval, while VeriPic's software can verify from the time

23  the picture was taken until retrieval.

24      Relying on this technological distinction between the software programs, VeriPic argues that

25  Foray's ADAMS software cannot "authenticate" digital evidence.  Docket No. 124-27 at 7-15.  VeriPic

26  argues that the term "authentication" in the digital asset management context refers to the process of

27  determining whether an image has been altered since the time it was originally captured.  *Id.*  VeriPic

28  argues that Foray's ADAMS software is not capable of performing this process because the software

United States District Court
For the Northern District of California

1   can only verify whether an image has been manipulated since the time it was downloaded into the

2   program.  *Id.*  VeriPic contends that the process Foray's software is capable of performing is known as

3   image "integrity," which is different from "authentication."  *Id.* at 8.  According to VeriPic, "integrity"

4   pertains to ensuring that the digital evidence is complete and unaltered from the time it is acquired by

5   the digital asset management system.  *Id.*  In response to VeriPic's contention, Foray argues that in the

6   context of digital asset management systems and as understood by the relevant audience, one can

7   "authenticate" digital assets by applying a hash algorithm to the digital assets when they are acquired

8   by the system, which will document all steps and processes—i.e., any changes—that are performed on

9   the asset.  Docket No. 107 at 9.

10          In support of its contention that "authentication" refers to the process of determining whether

11   an image has been altered since the time it was originally captured, VeriPic relies heavily on the SWGIT

12   guidelines.[5]  *See* Docket No. 124-27 at 7-15.  Those guidelines, however, prove too much: they

13   demonstrate that "authenticate" is used in many ways, depending on context.

14          SWGIT Section 13 provides: "Authentication is the process of substantiating that the content

15   is an accurate representation of what it purports to be.  For example, authentication of a digital image

16   of a gun on a table could be authenticated by a person at the scene stating the picture fairly and

17   accurately represents the gun on the table."  Docket No. 118-4, Siegel Decl. Ex. DS11 at 2; *accord*

18   Docket No. 119-11, Kwan Decl. K10 at 4.    As used in Section 13, SWGIT's definition of

19   "authentication" conforms with how the term is used in the courtroom as a requirement for the

20   admissibility of evidence.  *See, e.g.*, Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating

21   or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding

22   that the item is what the proponent claims it is.").  This definition of the term "authentication" is

23   different from, and much broader than, VeriPic's chosen definition.

24          VeriPic's definition focuses on the process of determining whether an image has been altered

25   since the time it was originally captured.  However, this process would be insufficient, by itself, to meet

26

27          [5] SWGIT refers to the Scientific Working Group on Imaging Technologies.  SWGIT guidelines
     are "traditionally recognized as a standard by which procedures to establish and maintain the
28   authenticity of digital images are measured."  Docket No 42-6, McClary Decl. ¶ 10.

United States District Court
For the Northern District of California

1    the SWGIT's Section 13 definition of "authentication." Even if an image is unaltered after it is

2    captured, the content of the image might still not be what it purports to be. An example of this concept

3    is provided in Section 14 of the SWGIT guidelines. In describing an authentication issue, Section 14

4    notes that an image purporting to be a picture of Paris might be unauthentic if the Washington

5    Monument were visible in the background. Docket No. 118-5, Siegel Decl. Ex. DS12 at 6. In such a

6    case, the image is unauthentic even if it has not been altered since the time it was originally captured.

7    These, and other examples in the SWGIT guidelines, demonstrate that under this definition of the term

8    "authentication," some human based observations are also needed to determine if a picture is truly

9    authentic,[6] and no piece of software by itself can fully authenticate an image. Indeed, VeriPic's own

10   expert agrees with this concept. Mr. McKay states in his expert declaration: "A true authentication will

11   involve multiple steps, which can include both human based observations and software based processes.

12   Generally speaking, both are required in order to conclude that an image or video is authentic." Docket

13   No. 123-1, McKay Decl. Ex. M1 at 4. Accordingly, VeriPic's purported definition of the term

14   "authentication" is different from the above definition provided in the SWGIT guidelines.[7]

15        The SWGIT guidelines also refer to a different, narrower type of authentication. Section 14

16   provides: "Forensic Image Authentication is the application of image science and domain expertise to

17   discern if a questioned image is an accurate representation of the original data by some defined criteria."

18   Docket No. 118-5, Siegel Decl. Ex. DS12 at 2. The guidelines explain that "Image Authentication is

19   a subtask of Image Analysis[,]" and "Image Authentication must not be confused with the requirement

20   to authenticate evidence as a precondition to admissibility in court." *Id.* Therefore, the guidelines

21   differentiate "Forensic Image Authentication" from "authentication" in the courtroom sense.

22

23   _____

24   [6] Another authentication issue identified by SWGIT that would require human based
     observations to resolve is "Detection of Staging." *See* Docket No. 118-5, Siegel Decl. Ex. DS12 at 5,

25   9.

26   [7] In its briefing, VeriPic also relies on testimony from SWGIT's former chair Dr. Bruegge to
     support its favored definition of "authentication." Docket No. 124-27 at 9-10. However, in the

27   testimony identified by VeriPic, Dr. Bruegge refers to the term "authentication" as it is used in the
     courtroom, not in the narrower manner advocated by VeriPic. Indeed, Dr. Bruegge mentions using

28   human-based observation in addition to software processes to conduct his authentication analysis. *See,
     e.g.*, Docket No. 122-2, Request for Judicial Notice Ex. 2 at 68:7-69:17, 73:20-74:6, 79:25-82:17.

United States District Court
For the Northern District of California

1    This "Forensic Image Authentication" appears to be the definition of the term "authentication"

2 which VeriPic uses in this case.  If a software program can determine that an image has not been altered

3 since the time it was originally captured by the camera, then the software is able to determine whether

4 the digital image "is an accurate representation of the original data."[8]  However, using this definition

5 of "authentication" creates some problems with VeriPic's argument.  First, the SWGIT guidelines do

6 not use the term "Forensic Image Authentication" in the context of digital asset management systems;

7 rather, the guidelines use the term in the context of "Image Analysis."[9]  *Id.*  VeriPic does not assert that

8 the challenged statements are being used in the context of image analysis.  Second, VeriPic argues that

9 "authentication" is very different from "integrity," but a review of the guidelines shows that the meaning

10 of the term "Forensic Image Authentication" is actually similar to and related to "integrity."

11    The SWGIT guidelines state: "Integrity differs significantly from authentication."  Docket No.

12 118-4, Siegel Decl. Ex. DS11 at 2.  However, in making this statement the guidelines refer to

13 authentication in the broader courtroom sense, not "Forensic Image Authentication."  Docket No. 118-4,

14 Siegel Decl. Ex. DS11 at 2 (explaining that integrity is different from authentication because

15 authentication "is the process of substantiating that the content is an accurate representation of what it

16 purports to be"); Docket No. 118-4, Siegel Decl. Ex. DS12 at 2 (explaining that integrity is different

17 from authentication because integrity "cannot demonstrate the veracity of the scene depicted in the

18 image").  Moreover, Section 13 of the guidelines defines "integrity" as the process of "ensur[ing] that

19 the information presented is complete and unaltered from the time of acquisition until its final

20 disposition."  Docket No. 118-4, Siegel Decl. Ex. DS11 at 2.  Under this definition, "Forensic Image

21

22    [8] VeriPic has presented the Court with other literature that also uses this narrower definition of

23 the term "authentication."  Docket No. 124-27 at 13-14.  Specifically, the "Forensic Imaging and Multi-media Glossary Covering Computer Evidence Recovery (CER), Forensic Audio (FA), Forensic Photography (FP), and Forensic Video (FV)" defines "authentication" as "[t]he process of determining

24 whether a recording or image is original, continuous, and free from unexplained alterations (e.g., additions, deletions, edits, or artifacts) and is consistent with the stated operation of the recording device

25 used to make it."  Docket No. 119-12, Kwan Decl. Ex. K11 at 19; *see also* Docket No. 119-13, Kwan Decl. Ex. K12.

26

27    [9] SWGIT defines the term "image analysis" as: "A sub-discipline of Digital & Multimedia Evidence, which involves the application of image science and domain expertise to examine and

28 interpret the content of an image and/or the image itself in legal matters."  Docket No. 119-11, Kwan Decl. K10 at 10.

United States District Court
For the Northern District of California

1   Authentication" is a type of "integrity" process.  If a software program can determine that an image has

2   not been altered since the time it was originally captured by the camera (i.e., it is an accurate

3   representation of the original data), then the software is capable of ensuring that the image "presented

4   is complete and unaltered from the time [it was acquired by the camera] until its final disposition."[10]

5   Therefore, under the guidelines, "Forensic Image Authentication" allows a person to establish the

6   "integrity" of the image from time it was captured by the camera, meaning that "Forensic Image

7   Authentication" is a subset of "integrity."

8       In sum, the SWGIT guidelines do not support VeriPic's contention that Foray's statements

9   regarding authentication are literally false.  VeriPic argues that Foray's statements are false because

10  Foray's software can only establish the integrity of an image; the software cannot authenticate an image.

11  But, under the SWGIT guidelines, VeriPic's purported definition of "authentication" is a type of

12  "integrity" process.  Further, that the guidelines use the word "authentication" to describe an "integrity"

13  process supports the conclusion that, in the software context, the terms are conflated with each other.

14      Moreover, Foray has presented the Court with unrebutted evidence showing that the digital asset

15  management software industry uses the term "authentication" when referring to the ability to ensure the

16  "integrity" of images.  Specifically, Foray has presented evidence showing that its competitors, Linear

17  Systems, QueTel, and DataWorks Plus, refer to establishing the "authenticity" of images by using hash

18  value technology which ensures that the image is unaltered from the time it is placed in the system—i.e.,

19  ensures the image's integrity.  *See* Docket No. 100-7, Cox. Decl. Ex. H; Docket No. 98, Temple Decl.

20  Ex. A at 10, Ex. B at 2-1, 2-2, 2-11, 2-12, 2-16, 2-17; Docket No. 111, Disney Decl. ¶¶ 3-6, Ex. A.  Not

21  only do these competitors use the term "authentication" in this manner, but VeriPic itself also uses the

22  term in this manner.  In the "FAQ" section of its website, VeriPic states:

23      2. Which is better, Authentication or "Acquisition Authentication"?
        In dealing with digital photos, "Acquisition Authentication" refers to knowing that a
24      photo hasn't changed starting from when it *enters the computer* moving forward.
        Authentication means knowing that a file hasn't changed from when the *camera took the*
25      *picture* moving forward.  Knowing a photo is authentic from the time you put it into the
        system is a half-measure.  True authentication is proving originality over the entire life

26

27      ———————————
        [10] Section 13 of the guidelines provides other examples of "integrity" processes that focus mainly
28  on keeping a proper chain of custody over an image from the time it is acquired to the time of retrieval.
        *See* Docket No. 118-4, Siegel Decl. Ex. DS11.

13

**United States District Court**
For the Northern District of California

of the evidence, back to the time the actual picture was taken.  VeriPic has True Authentication . . . .

Docket No. 42-2, Witzke Decl. Ex. A (emphasis in original).  Here, VeriPic refers to two types of authentication, but both types involve determining that the image has not been altered since acquisition—i.e., ensuring the integrity of the image.[11]  Further, although VeriPic refers to the process of determining that an image has not changed starting from when it enters the computer moving forward as a different type of authentication, VeriPic still uses the word "authentication" to refer to that process.[12]

In addition, Foray has presented the Court with unrebutted evidence showing that purchasers of digital asset management software conflate the term "authentication" with "integrity," and use the term "authentication" to refer to the process of ensuring that an image is unaltered from the time it was entered into the software system.[13]  *See* Docket No. 108, Cox Decl. Ex. A at 47:2-48:25, Ex. B at 40:24-41:12, Ex. C at 53:23-54:16, 80:21-81:22; Docket No. 127, Cox Dec. Ex. H at 48:5-49:18, Ex. I at 44:6-21.  The only evidence VeriPic has provided of a purchaser using the term "authentication" in VeriPic's chosen manner is an RFP from the National Transportation Safety Board ("NTSB").  In the RFP, the NTSB states:  "Photo Authentication is a mandatory requirement. . . . By "Authentication" we specifically mean the examination of the photos at the time it is imported into the system to look for signs that the photos were edited by photo editing software **PRIOR** to import into the system and **PRIOR to acquisition** of the photo into the system."  Docket No. 119-8, Kwan Decl. Ex. K7 at 1 (emphasis in original).  Although the NTSB uses the term "authentication" in the same manner as VeriPic, the NTSB found it necessary to provide an express definition of how it was using the term and to bold and capitalize the word "prior" to make clear that the software must be able to determine

---

[11] The distinction between these two terms is the point of acquisition.  VeriPic's "Acquisition Authentication" refers to acquisition by the computer program.  VeriPic's "True Authentication" refers to acquisition by the digital camera.

[12] Notably, on the webpage, VeriPic does not attempt to draw the distinction between "authentication" and "integrity" that it does now in its briefing.

[13] Both sides agree that these purchasers spend many months, if not a year or more, evaluating the software prior to making a purchasing decision.  *See* Docket No. 45-5, Kwan Decl. ¶ 5; *see, e.g.*, Docket No. 108-2, Cox Decl. Ex. B at 55:24-56:8, 57:9-58:10.

whether an image had been altered since the time it was captured by the camera. This suggests that the NTSB was not using a common definition of the term "authentication," or at the very least that there is some other definition of the term "authentication" that the NTSB found it necessary to distinguish in its use of the term. Accordingly, the record before the Court shows that in the software asset management system industry, both the manufacturers of the software and the purchasers of the software use the term "authentication" to refer to the process of ensuring that an image is unaltered from the time it was entered into the software system.

Finally, the testimony from VeriPic's experts does not support a finding that the statements at issue are unambiguously false. VeriPic's first expert, Mr. McKay, states "'authentication' is commonly defined within the law enforcement community as the ability to determine whether or not an image or video is a true and accurate depiction of the scene." Docket No. 123-1, McKay Decl. Ex. M1 at 4. Mr. McKay states that this is the common definition of the term "authentication," but he does not state whether it is the only definition of the term. In addition, he does not state that this is how the term is used when specifically referring to digital asset management software. Mr. McKay opines that the ADAMS software cannot authenticate an image under that definition of the term "authentication." *Id.* at 4-6. But, the definition of "authentication" Mr. McKay uses is the broad courtroom definition of the term, and no software can authenticate an image in this manner because human based observations are necessary to perform that type of authentication. In the report, Mr. McKay agrees that human based observations are necessary to perform a true authentication. *See id.* Therefore, because no software is capable by itself of "authentication" in the courtroom sense of the word, Mr. McKay's testimony actually supports the conclusion that in the software context, the word "authentication" refers to something else.

VeriPic's second expert, Mr. Goffe, states: "I use the term 'authentication' to verify that my images have not been manipulated or altered to misrepresent the image as originally taken (captured)." Docket No. 121-1, Goffe Decl. Ex. G at 3. Here, Mr. Goffe states that this is how he personally uses the term "authentication," but he does not state whether this is the definition the rest of the law enforcement community uses when referring to this type of software or whether it is the only way to define that term. More importantly, Mr. Goffe's expert report supports the conclusion that when

United States District Court
For the Northern District of California

referring to software, the term "authentication" is conflated with the term "integrity." In the report, Mr. Goffe opines that Foray's ADAMS software does not "authenticate" under his definition of that term "because it does not offer authentication to when the images were captured and does not show proof as to the integrity of the *original* image." *Id.* at 4 (emphasis in original). Here, Mr. Goffe uses the words "authentication" and "integrity" to refer to the same thing—proving that the image is an unaltered version of the original image that was captured by the camera. In another example, Mr. Goffe states in his expert report: "[T]he ADAMS system can only 'authenticate' what has been or is being managed within their system and not what evidence existed before it was entered into the Foray system." *Id.* at 3. Here, Mr. Goffe uses the term "authenticate" to refer to the ADAMS software's ability to ensure the integrity of the image once the image has been acquired by the software.

In conclusion, even viewing the evidence in the light most favorable to VeriPic, all of the evidence before the Court supports the finding that in the digital asset management system industry, it is common to use the term "authentication" when referring to "integrity" processes, including specifically the use of hash values. Therefore, no reasonable jury could conclude that Foray's use of the term "authentication" in this context is unambiguously false.[14] Accordingly, summary judgment of VeriPic's false advertising claims with respect to these statements is appropriate.[15]

---

[14] VeriPic also specifically challenges Foray's use of the term "authentication" in the following statement: "SWGIT states that the best way to authenticate digital assets is to use a hash algorithm that assigns a hash value to each image." Docket No. 124-27 at 15. Attached to this statement is a footnote citing to page 5, section 13 of the SWGIT guidelines. Docket No. 119-1, Kwan Decl. Ex. K1 at 14. Section 13 is entitled "*Best* Practices for Maintaining the Integrity of Digital Images and Digital Video." Docket No. 118-4, Siegel Decl. Ex. DS11 at 2 (emphasis added). Under the header "Methods for Demonstrating Integrity," the very first method listed is the use of a hash value. *Id.* at 4. In addition, the only example workflow in Section 13 that involves the use of digital asset management software is a workflow that utilizes hash references. *Id.* at 5-6. As explained above, the evidence in the record shows that in the digital asset management industry, companies use the term "authentication" to refer to the ability to ensure the "integrity" of an image. Accordingly, no reasonable jury could determine that this statement in context is unambiguously false.

[15] In its motion, Foray also argues that it is entitled to summary judgment of these claims because its software can determine that a digital image has not been altered since the time it was captured by a camera when the ADAMS software is coupled with Foray's WAN Connect product. Docket No. 107 at 10. Because the Court grants summary judgment of these claims on the above grounds, the Court declines to address this additional argument.

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii.     Statement Regarding the SWGIT Workflow

VeriPic also asserts that Foray's statement regarding workflow #2 from section 13 of the SWGIT guidelines is literally false.  Docket No. 124-27 at 15-17.  The challenged statement is as follows:

> NOTE: While some vendors may claim they are ASCLD or SWGIT compliant, no other digital evidence management system vendor complies with the SWGIT workflow shown above.  ONLY the Foray ADAMS solution meets this requirement!

Docket No. 119-1, Kwan Decl. Ex. K1 at 14.  VeriPic argues that this statement is literally false in two ways: (1) the SWGIT workflow referenced in Foray's advertisement is not a "requirement," but rather it is "workflow #2" of four "example" workflows listed in that section; and (2) the word "only" is literally false because ADAMS is not alone among software consistent with this workflow, since VeriPic's DPL software is also consistent with this workflow.  Docket No. 124-27 at 16.  In response, Foray argues that this statement is accurate in its context.  Docket No. 107 at 16-18.

The referenced workflow is workflow #2 from section 13 of the SWGIT guidelines.  *See* Docket No. 118-3, Siegel Decl. Ex. DS10 at 6.  Section 13 is entitled "Best Practices for Maintaining the Integrity of Digital Images and Digital Video."  *Id.* at 2.  Section 13 contains four "Example Workflows."  *Id.* at 4-8.  Each "workflow" is a list of steps users may take in order to achieve some objective related to ensuring integrity.  Workflow #2 is the only workflow that involves the use of a digital asset management system.  *See id.*  Section 13 states that "[t]he following . . . list of specific workflow examples . . . is not exhaustive as each situation requires tailoring a specific process that should be outlined in an organization's SOPs."  *Id.*  VeriPic contends that calling an example a "requirement" is literally false.  Docket No. 124-27 at 16.  In response, Foray argues that its use of the word "requirement" does not mean that its software is the only way to be consistent with the SWGIT workflow.  Docket No. 107 at 17.  Rather, its ADAMS software is one known way to comply with SWGIT.  *Id.*  The Oxford English Dictionary defines "requirement" as "something wanted or needed."  Oxford English Dictionary, 3d Ed.  Here, Foray's use of the word "requirement" merely conveys that its software uses a series of steps known to be wanted or needed by the example workflow—i.e, consistent with it, as it is written.  Foray's use of the word "requirement" does not exclude the possibility that others can add or change steps in the workflow to ensure integrity.  Its use here only

1  guarantees to customers that Foray's software, at a minimum, is consistent with the example provided

2  by SWGIT for ensuring integrity through the use of a digital asset management system.

3      VeriPic also takes issue with Foray's assertion that *only* its ADAMS software complies with

4  workflow #2. VeriPic contends that this use of the word "only" is literally false because VeriPic's DPL

5  software also complies with the workflow. Docket No. 124-27 at 17. However, the evidence VeriPic

6  presents in support of this contention undercuts its arguments. VeriPic's CEO states that in complying

7  with the workflow, DPL "also provides other features to ensure the integrity of digital evidence stored

8  in its systems." Docket No. 119, Kwan Decl. ¶ 9. VeriPic's CEO goes on to explain: "It is VeriPic's

9  position that the most secure method of making photo enhancements to digital evidence is to do so

10  without making duplicates. Therefore, VeriPic provides its customers functionality allowing a user to

11  enhance digital evidence without making copies." *Id.* ¶ 10. The process described in workflow #2

12  involves making a copy of an image and saving it as a new file whenever the image is viewed or used

13  for processing. Docket No. 118-3, Siegel Decl. Ex. DS10 at 6. VeriPic's product cannot be literally

14  consistent with the workflow—rendering Foray' statement unambiguously false—where its product

15  allows user to deviate from the steps listed in that workflow. In sum, based on the above evidence, the

16  Court concludes that no reasonable jury could conclude that Foray's statements about the workflow

17  were literally false. Accordingly, summary judgment of VeriPic's false advertising claims with respect

18  to these statements is appropriate.

19

20      **C.      Conclusion**

21      In sum, VeriPic has failed to provide sufficient evidence to create a genuine dispute of fact as

22  to whether the statements at issue were either literally false or likely to deceive or confuse consumers.

23  Accordingly, the Court grants summary judgment of plaintiff's claims for false advertising under the

24  Lanham Act, violation of the FAL, and violation of the UCL.[16]

25  _____

26      [16] In its motion, Foray also moves for summary judgment of these claims on the grounds that
    VeriPic has failed to provide any evidence showing that the alleged misrepresentations were material.
    Docket No. 107 at 19-20. In support of this argument, Foray has presented the Court with a substantial

27  amount of testimony from purchasers of its ADAMS software, stating that the identified statements did
    not influence their decision to purchase Foray's software. *See* Docket No. 100, Cox. Decl. Ex. Q at

28  36:14-41:8, Ex. R at 44:25-51:21; Docket No. 108, Cox Decl. Ex. A at 33:25-36:10, 37:14-16, Ex. B

United States District Court
For the Northern District of California

## II. Plaintiff's Copyright and Copyright Related Claims

Foray moves for summary judgment of plaintiff's claims for copyright infringement, inducement of breach of contract, contributory and induced copyright infringement, and violation of the Digital Millennium Copyright Act. Docket No. 107 at 1-7.

### A. Plaintiff's Claim for Copyright Infringement

VeriPic asserts that on or about 2008, Foray obtained VeriPic's Digital Photo Lab software and unlawfully copied VeriPic's Calibration Module software into Foray's Image Calibration Utility software. FAC ¶¶ 16-20. Plaintiff asserts that Foray began offering for sale and distributing the infringing software on or around September 2009. *Id.* ¶ 19; Docket No. 100-2, Cox Decl. Ex. B at 11 (VeriPic's Supplemental Responses to Foray's Interrogatories, Set One). In its motion, Foray argues that there is no evidence supporting VeriPic's allegations. Docket No. 107 at 1. In addition, Foray argues that the undisputed evidence shows that it independently created the software at issue. *Id.* at 4-5.

"To establish copyright infringement, the holder of the copyright must prove both valid ownership of the copyright and that there was infringement of that copyright by the alleged infringer." *N. Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir. 1992); *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) ("To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."). "If the plaintiff copyright holder survives the first step, i.e., it establishes that it owns a valid copyright, then the plaintiff must establish infringement by showing both access to its copyrighted material on the part of the alleged infringer and substantial similarity between the copyrighted work and the alleged infringing work." *N. Coast Indus.*, 972 F.2d at 1033. However, even if a plaintiff makes a sufficient showing of these two elements, a defendant can rebut this showing of infringement by demonstrating that it independently created the accused article. *See Three Boys Music Corp. v. Bolton*,

---

at 19:22-20:24, 39:24-42:11; Docket No. 127, Cox Dec. Ex. H at 48:5-49:18, Ex. I at 44:6-21. In response, VeriPic argues that it is entitled to a presumption of materiality because the statements are literally false and because the statements relate to an inherent quality or characteristic of Foray's software. Docket No. 124-27 at 19-22. Because the Court grants summary judgment of these claims on the above grounds, the Court declines to address these additional arguments.

United States District Court
For the Northern District of California

212 F.3d 477, 486 (9th Cir. 2000); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1228 n.7 (3d Cir. 1986) ("[I]ndependent creation is a complete defense to a claim of copyright infringement.").

Foray argues that there is no evidence in the record showing that it ever had access to VeriPic's copyrighted material.  Docket No. 107 at 2-4.  In support of this argument, Foray cites to deposition testimony from Foray employees where they explain that they observed the use of VeriPic's software, but that they never obtained a copy of the software or its source code.  *Id.* (citing Docket No. 100, Cox. Decl. Exs. C, D); *see also* Docket No. 109, Slaughter Decl. ¶ 4.  In response, VeriPic argues that there is evidence showing that Foray personnel obtained a copy of VeriPic's software.  Docket No. 124-27 at 25.  VeriPic cites to an October 24, 2005 email from Lynn Slaughter, a Foray sales representative, to other Foray employees.  Docket No. 124-47, Siegel Decl. Ex. DS32.  The email states: "I will be getting a VeriPic DVD at the CBD conference that I will send in to the office.  (Our client will bring me one . . .)." *Id.*  This evidence by itself is insufficient to create a genuine dispute of fact as to whether Foray obtained access to VeriPic's software.  Viewing the evidence in the light most favorable to plaintiff, the email merely states that the employee was attempting to obtain a copy of the software.  VeriPic has failed to provide the Court with any evidence showing that Ms. Slaughter did indeed obtain a copy of the software.  To the contrary, the only evidence in the record states that Ms. Slaughter never received a copy of any VeriPic software.  Docket No. 109, Slaughter Decl. ¶ 4.  Therefore, VeriPic has failed to meet its burden of showing that there is a triable issue of fact as to whether Foray had access to VeriPic's software.

Moreover, Foray has provided the Court with evidence showing that it independently created its Image Calibration Utility software by at least 2005.  Docket No. 107 at 4-5.  Specifically, Foray has provided the Court with a declaration from its source code expert, Coral Lerche.  Docket No. 97, Lerche Decl.  In the declaration, Ms. Lerche states that she reviewed the source code for Foray's Image Calibration software as it was archived in 2005 and as it exists in its current version.  *Id.* ¶ 3.  Ms. Lerche states that the only differences between the two versions are (1) the introduction of a license manager in place of an ad hoc registration code; (2) changes related to version changes in surrounding tools used to develop the software; and (3) initial changes to the product's name and displayed company

20

name. *Id.* Moreover, Ms. Lerche states that there were no changes at all in Foray's Image Calibration Utility software between November 28, 2007 and September 1, 2010. *Id.* ¶ 4. VeriPic has not presented the Court with any evidence challenging Ms. Lerche's statements, or showing that Foray made material changes to its Image Calibration Utility software during the relevant time period. Therefore, the undisputed evidence before the Court shows that Foray independently created its Image Calibration Utility software by at least 2005, which is well before the time that VeriPic asserts the accused software was modified. *See* Docket No. 100-2, Cox Decl. Ex. B at 11 (asserting that Foray began selling and distributing the infringing software on or around September 2009). Accordingly, the Court grants summary judgment of plaintiff's claims for copyright infringement.

**B. Plaintiff's Claim for Violation of the Digital Millennium Copyright Act**

VeriPic asserts that Foray violated the Digital Millennium Copyright Act by improperly circumventing the technological protection measures that control access to the source code in VeriPic's Copyrighted Works. FAC ¶ 70. 17 U.S.C. § 1201(a)(1)(A) prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected under [the Copyright Act]." *Accord MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 942 (9th Cir. 2010). To "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A).

Foray argues that there is no evidence showing that it circumvented VeriPic's technological protection measures. Docket No. 107 at 6-7 (citing Docket No. 100-3, Cox. Decl. Ex. C at 32:24-33:22, 36:18-37:12). The Court agrees. VeriPic has failed to provide the Court with any evidence showing that Foray obtained access to VeriPic's software. *See supra* Section II.A. If Foray did not have access to the software, Foray could not have circumvented the technological protection measures contained in

///

///

United States District Court

For the Northern District of California

1  the software.[17]  Accordingly, the Court grants summary judgment of plaintiff's claim for violation of

2  the Digital Millennium Copyright Act.

3

4      **C.      Plaintiff's Claim for Contributory and Induced Copyright Infringement**

5      VeriPic asserts that Foray has induced or materially contributed to the infringement of VeriPic's

6  Copyrighted Works by VeriPic customers.   FAC ¶ 61.   A defendant is liable for contributory

7  infringement of a copyright if it (1) has knowledge of a third party's infringing activity, and (2) induces,

8  causes, or materially contributes to the infringing conduct.  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494

9  F.3d 788, 795 (9th Cir. 2007) (citing *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)).

10     Foray argues that there is no evidence of copyright infringement to support this claim.  Docket

11  No. 107 at 6.  In its opposition, VeriPic fails to identify the third-party infringement that is the basis of

12  its claim for contributory and induced copyright infringement.  The only evidence VeriPic provides in

13  its opposition is the October 24, 2005 email from Ms. Slaughter.  Docket No. 124-27 at 25.  The email

14  only shows that Ms. Slaughter was attempting to obtain VeriPic's software from a client.  Docket No.

15  124-47, Siegel Decl. Ex. DS32.  VeriPic has failed to provide the Court with any evidence showing that

16  she obtained the software, and the only evidence before the Court states that Ms. Slaughter never

17  received any VeriPic software.  Docket No. 109, Slaughter Decl. ¶ 4.  Without evidence of copyright

18  infringement by a third party, Foray cannot be liable for contributory or induced infringement.  *See*

19  *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1092 (9th Cir. 1994).  Accordingly,

20  the Court grants summary judgment of plaintiff's claims for contributory and induced copyright

21  infringement.

22

23     **D.      Plaintiff's Claim for Inducement of Breach of Contract**

24     VeriPic asserts that Foray intentionally encouraged and assisted VeriPic's customers to breach

25  their end user licensing agreements by allowing Foray employees access to and use of VeriPic's

26

27     [17] Moreover, even assuming Foray had obtained access to VeriPic's software, there is no
   evidence in the record showing that Foray then circumvented the technological protection measures in
28  the software to access and copy VeriPic's source code.

*United States District Court*
For the Northern District of California

copyrighted works.  FAC ¶ 54.  The elements of a cause of action for "intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55 (1998).

Foray argues that there is no evidence showing that it intentionally induced a breach of VeriPic's end user license agreements.  Docket No. 107 at 6.  In response, VeriPic argues that the evidence cited in Foray's motion shows that Foray personnel engaged in a pattern of obtaining direct access to VeriPic's software by inducing customers to violate their end user license agreements.  Docket No. 124-27 at 25.  The evidence cited in the motion is testimony from two Foray employees stating that VeriPic customers allowed them to view VeriPic's Digital Photo Lab software while the customers were using the program.  *See* Docket No. 100, Cox Decl. Exs. C at 13:11-14:22, 16:5-17:11, Ex. D at 43:1-45:15, 49:13-50:9.  The Foray employees testified that they never directly used the software.  *See id.*  VeriPic fails to explain how merely allowing a third party to view VeriPic's software while the customer is using it is a breach of the end user license agreements.  In the FAC, VeriPic cites to several provisions contained in its end user license agreements.  FAC ¶ 13.  But, allowing a third party to view the software while it is in use would not violate any of these provisions.

In its opposition, VeriPic also references the October 24, 2005 email from Ms. Slaughter.  Docket No. 124-27 at 25.  The email only shows that Ms. Slaughter was attempting to obtain the software from a client.  Docket No. 124-47, Siegel Decl. Ex. DS32.  VeriPic has failed to provide the Court with any evidence showing that she obtained the software, and the only evidence before the Court states that Ms. Slaughter never received any VeriPic software.  Docket No. 109, Slaughter Decl. ¶ 4.  Moreover, VeriPic has not provided the Court with any evidence showing that the client mentioned in the email was a party to VeriPic's end user license agreement.  Without evidence showing that there was a contract between VeriPic and this particular third party, the email does not support VeriPic's claim for inducement of breach of contract.

In addition, VeriPic has not provided the Court with any evidence showing that Foray was aware of the end user licensing agreements at issue.  Therefore, VeriPic has failed to show that Foray had

23

1 knowledge of the contracts at issue.  Accordingly, the Court grants summary judgment of plaintiff's
2 claim for inducement of breach of contract.

3

4 **III.    Defendant's Affirmative Defenses**

5      Foray also moves for summary judgment of its affirmative defenses of laches and unclean hands.
6 Docket No. 107 at 18-22.  Because the Court grants summary judgment of all of VeriPic's claims,
7 Foray's motion for summary judgment of these affirmative defense is moot, and the Court need not
8 address these arguments.

9

10                          **CONCLUSION**

11      For the foregoing reasons, the Court GRANTS defendant's motion for summary judgment. This
12 Order resolves Docket Nos. 93, 141.

13

14      **IT IS SO ORDERED.**

15

16 Dated: February 11, 2014                    _____

17                                    SUSAN ILLSTON
                                     United States District Judge
18

19

20

21

22

23

24

25

26

27

28